587 A.2d 702

**SHV COAL, INC., Appellant,**

v.

**CONTINENTAL GRAIN CO., and Conticoal, a/k/a Conticoal Co., Conticoal, Inc., and Conticarriers & Terminals, Inc., and R. Stephen Kasey, Appellees.**

**SHV COAL, INC., Appellant,**

v.

**Ralph L. WINGROVE, Appellee.**

Supreme Court of Pennsylvania.

Argued Sept. 25, 1990.

Decided March 12, 1991.

Reargument Denied May 24, 1991.

490

Robert D. Douglass, William H. Blessing, pro hac vice, Cincinnati, Ohio, for appellant.

Errol S. Miller, Pittsburgh, for Continental Grain Co., and Conticoal a/k/a Conticoal Co., Conticoal, Inc. and Conticarriers & Terminals, Inc. and Ralph L. Wingrove.

Myron H. Tomb, Jr., Indiana, for Stephen Kasey and Ralph L. Wingrove.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

OPINION

ZAPPALA, Justice.

We granted the appellant's consolidated Petition for Allowance of Appeal limited to the issue of punitive damages. Specifically, appellant seeks our review of the order and opinion of the Superior Court which, in part, reversed the trial court which had assessed punitive damages against both Wingrove and ContiCoal. 376 Pa.Super. 241, 545 A.2d 917. Because the Superior Court has exceeded the proper scope of review in this matter, we reverse.

The appellant, SHV Coal, Inc. (SHV), a division of SSM Coal of the Netherlands, is located in Cincinnati, Ohio, and is involved in the coal brokerage business. The coal brokerage business is highly competitive relying heavily upon personal interactions between the brokerage's salesmen and the coal producers and users to obtain profitable contracts.

On or about September 10, 1980, SHV recruited Ralph L. Wingrove (Wingrove) from EEI, a coal brokerage located in Indiana, Pennsylvania. Prior to being employed by SHV, Wingrove had never sold any coal as a broker, although he had developed business contacts while a field representative with EEI. After sending Wingrove to the University of Cincinnati for business training, SHV relocated Wingrove to Indiana, Pennsylvania, for the purpose of opening a regional office. Upon his return to the Indiana area, Wingrove resurrected his old contacts and developed new ones to gain business for SHV. Between 1982 and 1984, the Indiana area office, which Wingrove managed, showed a profit even though overall SHV did not.

On March 1, 1983, Wingrove first met with Robert Parks, ContiCoal's Chief Executive Officer, in Chicago, at SHV's expense. From thence forward, Parks embarked on a course of conduct to entice Wingrove to leave SHV and

become employed by ContiCoal. This conduct included paying expense vouchers and numerous telephone calls while Wingrove remained an employee of SHV. In fact, Wingrove was issued a ContiCoal telephone credit card starting March 23, 1983. Within a week after the Chicago meeting, Wingrove and Parks planned a trip for Parks to travel to SHV's Indiana office for the purpose of recruiting SHV's salesman, Steve Reinoehl. On March 14 and 15, Wingrove and Parks met with Reinoehl at SHV's Indiana office for several hours in an attempt to convince him to leave SHV and join ContiCoal. Within a few days of that meeting, Wingrove extended a formal offer to Reinoehl on behalf of ContiCoal. Later on, Wingrove met in Chicago with Conti-Coal and another SHV salesman, R.S. Kasey, in an attempt to recruit him.

Prior to March 1983, Wingrove had been negotiating on SHV's behalf with representatives of Eastman Kodak's Rochester, New York, plant for Eastman Kodak's coal needs. Wingrove indicated to his supervisors that a contract with Eastman Kodak was about to be consummated.

On April 6, 1983, Wingrove accepted ContiCoal's offer to manage its regional office also located in Indiana, Pennsylvania, effective April 11. Notwithstanding having accepted ContiCoal's offer on April 6, Wingrove met with the purchasing agent for Eastman Kodak, Vauhn Hovey, on April 6 and advised him that he, Wingrove, was leaving SHV for ContiCoal. Wingrove then indicated that SHV was closing its Indiana office and that Wingrove had to refuse any purchase order for Eastman Kodak, but if one was offered to ContiCoal, it could be accepted. Because of its relationship with Wingrove, Eastman Kodak did agree to purchase coal from ContiCoal beginning April 12, 1983. It was not until the following day, April 7, 1983, that Wingrove tendered to SHV his formal letter of resignation effective April 15. Without the Eastman Kodak contract, ContiCoal would have had to reevaluate the feasibility of having an Indiana office and may have had to close it.

Having discovered what had secretly transpired, SHV filed a complaint against Wingrove and ContiCoal alleging breach of an agent's fiduciary duties, tortious interference with a prospective business relationship and conspiracy. The trial court, sitting in equity, determined that Wingrove in concert with ContiCoal had diverted a coal contract with Eastman Kodak from SHV to ContiCoal. Based upon this finding, the trial court awarded both compensatory and punitive damages against Wingrove and ContiCoal. On appeal, Superior Court affirmed in part and reversed in part. That court held that the evidence supported the trial judge's determination awarding compensatory damages but remanded for a recalculation of those damages. As to the punitive damages, the court held that the record supported a finding that Wingrove and ContiCoal tortiously interfered with SHV's business relationship with Eastman Kodak, but the evidence was insufficient to establish outrageous or malicious conduct.

■ Assessment of punitive damages are proper when a person's actions are of such an outrageous nature as to demonstrate intentional, willful, wanton or reckless conduct, *Pittsburgh Outdoor Adv. Co. v. Virginia Manor Apts., Inc.*, 436 Pa. 350, 260 A.2d 801 (1970), and are awarded to punish that person for such conduct. *Feingold v. Southeastern Pennsylvania Transportation Authority*, 512 Pa. 567, 517 A.2d 1270 (1986); *Restatement of Torts*, Section 908(1).

In *Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742 (1984), we adopted Section 908(2) of the *Restatement (Second) of Torts* which states:

(2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's *evil motive or his reckless indifference to the rights of others.* In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant. (Emphasis added).

Thereafter, in *Martin v. Johns–Manville Corp.*, 508 Pa. 154, 170–173, 494 A.2d 1088, 1097–1098 (1985), we discussed the concept of "reckless indifference to the rights of others", and the type of conduct necessary to establish punitive damages:

> Comment b following Section 908 further states that "[r]eckless indifference to the rights of others and conscious action in deliberate disregard of them (see § 500) may provide the necessary state of mind to justify punitive damages." However, our courts have not construed this statement as authority for the proposition that "reckless indifference to the rights of others," which provides a basis for an award of punitive damages, is equivalent to both distinct types of wanton or willful misconduct included in the Section 500 definition of those terms. In fact, "[w]anton misconduct as defined in § 500 of the Restatement of Torts 2d and in *Evans v. Philadelphia Transportation Co.*, 418 Pa. 567, 212 A.2d 440 (1965), is not the same as the 'outrageous conduct ... done with a reckless indifference to the interests of others....' " *McSparran v. Pennsylvania Railroad Company*, 258 F.Supp. 130, 134 (E.D.Pa.1966) (applying Pennsylvania law) (citations omitted), *quoted in Focht v. Rabada*, 217 Pa.Superior Ct. 35, 39–40, 268 A.2d 157, 160 (1970).

> Comment a to Section 500 describes two distinct types of reckless conduct which represent very different mental states: (1) where the "actor knows, or has reason to know, ... of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk;" and (2) where the "actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so." The first type of reckless conduct described in Section 500 demonstrates a higher degree of culpability than the second on the continuum of mental states which range from specific intent to ordinary negligence. An "indiffer-

ence" to a known risk under Section 500 is closer to an intentional act than the failure to appreciate the degree of risk from a known danger. This distinction is particularly important in determining what facts justify punitive damages in cases where, as here, liability is based on failure to warn against the risk of a disease with a long latency period arising out of exposure to a useful but unavoidably dangerous product.

Under Pennsylvania law, only the first type of reckless conduct described in comment a to Section 500, is sufficient to create a jury question on the issue of punitive damages. Thus, "punitive damages are awarded only for outrageous conduct, that is, for acts done with a bad motive or with a *reckless indifference* to the interests of others." *Chambers v. Montgomery,* 411 Pa. 339, 344, 192 A.2d 355, 358 (1963) (quoting comment b to Section 908[1] of the Restatement of Torts) (emphasis added). See *Feld v. Merriam,* 506 Pa. at [393–95,] 485 A.2d at 747. Comment b to Section 500, read in light of preceding comment a to that section, indicates that Section 908 damages are not justified where the defendant's mental state rises to no more than gross negligence. *Accord Thomas v. American Cystoscope Makers, Inc.,* 414 F.Supp. 255, 267 (E.D.Pa.1976) (applying Pennsylvania law in a products liability action). *See also Campus Sweater & Sportswear v. M.B. Kahn Constr. Co.,* 515 F.Supp. 64, 104 (D.S.C.1979), *affirmed,* 644 F.2d 877 (4th Cir.1981) ("South Carolina, as do most other jurisdictions, requires misconduct above and beyond mere negligence or gross negligence"). (Footnotes omitted).

■ The determination of whether a person's actions arise to outrageous conduct lies within the sound discretion of the fact-finder and will not be disturbed by an appellate court so long as that discretion has not been abused. Likewise, in equity matters, our standard of review "... is limited to a determination of whether the Chancellor committed an error of law or abused his discretion. The scope of review of a final decree in equity is limited and will not

be disturbed unless it is unsupported by the evidence or demonstratively capricious." *Lower Frederick Twp. v. Clemmer,* 518 Pa. 313, 543 A.2d 502 (1988).

■ Reviewing the record, it is clear that sufficient evidence was presented to support the award of punitive damages. Eastman Kodak was ready, willing and able to give a purchase order for coal to SHV. The trial court believed that at the time Wingrove approached Eastman Kodak on April 6, he had already accepted an offer from ContiCoal, yet did not disclose that information to SHV. Furthermore, Parks admitted speaking with Wingrove about the Eastman Kodak account in March, which would have been prior to Wingrove accepting ContiCoal's offer. Finally, the evidence established that Parks and Wingrove had an extensive telephone conversation on the day the Eastman Kodak contract was diverted to ContiCoal while Parks was in Wisconsin on other business. From this circumstantial evidence and reviewing the credibility of all the witnesses, the chancellor could conclude that but for the actions of both Wingrove and ContiCoal, the SHV–Eastman Kodak contract would have been solidified.

While we are not making a judgment as to whether we believe that the conduct of Wingrove and ContiCoal was outrageous, we must conclude that the trier of fact did not abuse his discretion in so finding. Accordingly, the order of the Superior Court is reversed and the judgment of the Court of Common Pleas of Indiana County is reinstated.

Judgment Reversed.

LARSEN and McDERMOTT, JJ., did not participate in the consideration or decision of this case.