**RUBIN QUINN MOSS HEANEY & PATTERSON, P.C., Plaintiff,**

v.

**John R. KENNEL, II, Defendant.**

**Civ. A. No. 92–CV–1424.**

United States District Court,
E.D. Pennsylvania.

Aug. 31, 1993.

Denis James Lawler, Monica E. O'Neill, Philadelphia, PA, for plaintiff.

John R. Kennel, II, pro se.

## FINDINGS OF FACT, DISCUSSION, AND CONCLUSIONS OF LAW

ROBRENO, District Judge.

This case involves the misappropriation of client funds by John R. Kennel, II, an associate, and later partner, at the law firm of Rubin Quinn Moss Heaney & Patterson, P.C. Rubin Quinn made good on the losses to its clients occasioned by Kennel's wrongdoing, and brought the current action to recover these payments. The case was tried to the Court without a jury over the course of five days in February and March of 1993. For the reasons set out below, the Court finds for the Plaintiff.[1]

## I. FINDINGS OF FACT

### Parties

1. Plaintiff Rubin Quinn Moss Heaney & Patterson, P.C. ("Rubin Quinn" or "Plaintiff"), is a Pennsylvania professional corporation[2] engaged in the practice of law with its principal office located at 1800 Penn Mutual Tower, 510 Walnut Street, Philadelphia, PA 19106.

2. Plaintiff is the successor in interest to Rubin Quinn Moss Heaney & Patterson, a partnership engaged in the practice of law with its principal office located at the same address. From February 16, 1986, through March 31, 1991, the partnership operated at various times under the names Rubin Quinn & Moss, Rubin Quinn Moss & Heaney, and Rubin Quinn Moss Heaney & Patterson. Rubin Quinn Moss Heaney & Patterson incorporated its practice and transferred all of its assets and liabilities to Plaintiff as of April 1, 1991.

3. Pursuant to a resolution adopted at a duly constituted meeting of the partners, the corporation's name was changed to Rubin Quinn Moss & Patterson, P.C., ("Rubin Quinn" or "Plaintiff") effective June 1, 1992.

4. Defendant John R. Kennel, II, ("Kennel" or "Defendant") is an individual who is a resident and citizen of the State of Virginia. Defendant is a member of the Pennsylvania bar.

5. Defendant was employed by Rubin Quinn as an associate attorney from approximately February 16, 1986, through December 31, 1987, and was a partner at Rubin Quinn from January 1, 1988, through his termination from the partnership effective July 31, 1990.

6. Defendant was expelled from Rubin Quinn at a special partners' meeting on July 31, 1990, by a unanimous vote of the partners who were present, including thirteen of the

---

1. This memorandum constitutes the Court's findings of fact and conclusions of law. *See* Fed. R.Civ.P. 52.

2. Although the members of Rubin Quinn are shareholders and not partners, the parties in the case have repeatedly referred to the shareholders as the "partners" of Rubin Quinn. This Court will adopt this usage and refer to "partner" throughout.

sixteen partners, a ¾ vote being needed for expulsion under Rubin Quinn's Partnership Agreement (the "Partnership Agreement").

7. Defendant's area of practice is real estate law. While at Rubin Quinn, Defendant performed legal services for Rubin Quinn's clients relating primarily to the purchase, sale, lease, and rental of private and commercial properties.

8. While at Rubin Quinn, Defendant also functioned as an approved attorney with Lawyers Title Insurance Corporation. As an approved attorney, Defendant performed the functions of a title agent, including the handling of all receipts and disbursements related to real estate transactions.

*Brown Brothers Accounts*

9. Shortly after he began working at Rubin Quinn, Defendant developed a program for handling escrow funds generated in closing real estate transactions for Rubin Quinn clients.

10. Defendant's concept regarding the purpose and operation of the real estate accounts was as follows:

a. The accounts would contain escrow funds, entrusted to Defendant and Rubin Quinn by Rubin Quinn's clients, in connection with the real estate transactions to be handled by Defendant;

b. Through these accounts, Rubin Quinn would administer all receipts and disbursements relating to real estate transactions handled by Defendant on behalf of Rubin Quinn's clients, including receipts from and disbursements to buyers, sellers, title companies, Rubin Quinn itself, and other third parties;

c. Defendant would be solely responsible for the operation, maintenance, record-keeping, review, and reconciliation of the accounts;

d. Five accounts were to be established, each one dedicated to a single real estate transaction at a time; and

e. As each real estate transaction was completed, receipts for that transaction would necessarily equal disbursements, so that no funds would remain in the account and the account could be re-used on a rolling basis for the next real estate transaction. The underlying concept was called "zero balancing."

11. Defendant suggested the accounts and explained their purpose and operation to Don P. Foster, a then associate at Rubin Quinn, who had been responsible for recruiting Defendant to Rubin Quinn. Through Mr. Foster's high school roommate, Mark O'Brien, Defendant established contact with John Pickering, II, a Deputy Manager in the Banking Department at Brown Brothers Harriman & Co. ("Brown Bros.").

12. By the end of May 1986, Defendant had obtained the approval of Rubin Quinn to open five accounts at Brown Bros. (collectively, the "Brown Bros. Real Estate Accounts") in accordance with the concept described *supra* in paragraph 10, as follows:

| ACCOUNT NO. | LETTER DESIGNATION |
|---|---|
| 7028798 | A |
| 7028806 | B |
| 7028814 | C |
| 7028822 | D |
| 7028830 | E |

13. The Brown Bros. Real Estate Accounts were titled in the name of Rubin Quinn, but contained client escrow funds. Defendant, as well as Messrs. Alexander N. Rubin, Jr., and William P. Quinn, two of Rubin Quinn's senior partners, became authorized signatories on the accounts.

14. From November 6, 1986, through December 16, 1988, Defendant made unauthorized disbursements from the Brown Bros. Real Estate Accounts for purposes unrelated to the real estate transactions of Rubin Quinn's clients in the total sum of $203,029.36 (the "Unauthorized Disbursements").[3] Netting this misappropriation against $67,832.49 deposited by Defendant, the Brown Bros. Real Estate Accounts suffered a net shortfall of $135,196.87.[4]

---

3. Defendant made $132,733.77 in Unauthorized Disbursements while an associate, and $70,295.59 while a partner.

4. The net shortfall at the end of Defendant's tenure as an associate was $121,401.28.

15. The Defendant made the following Unauthorized Disbursements:

a. A check, dated November 6, 1986, in the amount of $5,000 payable to Defendant himself;

b. A check, dated November 6, 1986, in the amount of $1,000 payable to Mr. Foster[5] to repay a personal loan, which Defendant deposited into Mr. Foster's personal account, without Mr. Foster's endorsement, while Mr. Foster was out of the country;

c. Thirteen checks, dated between December 3, 1986, and July 2, 1987, in the total sum of $17,122.08 payable to Queenstown Bank of Maryland, the mortgagee of certain property owned by Prospect Associates, a real estate development partnership in which Defendant was in partnership with Mr. Foster and others;

d. Four checks, dated between December 27, 1986, and October 30, 1987, in the total sum of $48,522.30 to satisfy a confessed judgment entered by Stephen Black Builders against Defendant personally;

e. A check, dated January 30, 1987, in the sum of $2,150.00 payable to Gerald Keener;

f. Four checks, dated between February 28, 1987, and March 10, 1988, in the total sum of $2,645.59 to pay the homeowner's association, sewer, and tax bills of certain property owned by Prospect Associates;

g. Five checks, dated between March 30, 1987, and August 19, 1987, in the total sum of $750 involving Robert Booker, a prior owner of certain property owned by Prospect Associates who was also a client of Rubin Quinn;

h. A check, dated June 5, 1987, in the sum of $750.00 payable to Steven Barsamian, Esquire, as a retainer paid by Defendant for the benefit of his friend, Mark Blackburn, for legal services relating to immigration work performed by Mr. Barsamian for one of Mr. Blackburn's employees;

i. A check, dated June 11, 1987, in the sum of $437.00 payable to Charles Robinson, a tenant on certain property owned by Prospect Associates;

j. A check, dated July 3, 1987, in the sum of $21,827.85 payable to Richard J. Bennett, Inc. to pay off a second mortgage on certain property owned by Prospect Associates;

k. A check, dated July 14, 1987, in the sum of $10,000 payable to John D. Sauder, Defendant's friend;

l. A check, dated July 27, 1987, in the sum of $498.01 payable to Rubin Quinn, involving Defendant's payment of legal fees owed by Ron Swank of Heritage Corporation to Rubin Quinn;

m. Two checks, dated October 20, 1987, and December 1, 1987, in the total sum of $18,826.53 representing the down payment and school taxes for Defendant's own personal residence;

n. Four checks, dated between December 14, 1987, and September 2, 1988, in the total sum of $55,000 relating to St. Asaph's Associates, a real estate development partnership in which Defendant was in partnership with Mr. Foster and others;

o. A check, dated February 15, 1988, in the sum of $13,000 payable to James Thompson, Defendant's friend and partner in Prospect Associates;

p. A check, dated December 16, 1988, in the sum of $1,500.00 payable to Thompson and Associates, Inc.; and

q. A shortfall of $4,000.00 relating to David Jones's closing.

16. Defendant was given credit for deposits he made to the Brown Bros. Real Estate Accounts as follows:

---

**5.** There is no evidence that Mr. Foster played a role in any of Defendant's financial misdeeds.

| DATE | AMOUNT | PAYOR |
|---|---|---|
| 10/20/86 | $ 1,000.00 | Prospect Associates |
| 11/6/86 | 3,000.00 | Prospect Associates |
| 11/19/86 | 1,000.00 | Prospect Associates |
| 12/16/86 | 2,500.00 | Prospect Associates |
| 5/4/87 | 2,500.00 | Prospect Associates |
| 6/8/87 | 1,332.49 | Prospect Associates |
| 2/5/88 | 15,000.00 | Prospect Associates |
| 1/21/88 | 5,000.00 | St. Asaph's Associates |
| 1/21/88 | 20,000.00 | St. Asaph's Associates |
| 4/29/88 | 10,000.00 | St. Asaph's Associates |
| 8/8/88 | 5,000.00 | St. Asaph's Associates |
| 12/30/88 | 1,500.00 | St. Asaph's Associates |
| TOTAL: | $67,823.49 | |

*Marian Bank Account*

17. At the end of 1988, Account No. 1013854 was established at Marian Bank by Rubin Quinn, titled in Rubin Quinn's name (the "Marian Bank Real Estate Account," and together with the Brown Bros. Real Estate Accounts, the "Real Estate Accounts").

18. In early 1989, the balance of the funds contained in the Brown Bros. Real Estate Accounts were transferred to the Marian Bank Real Estate Account.

19. The purpose, operation, maintenance, recordkeeping, review, and reconciliation of the Marian Bank Real Estate Account was identical to that of the Brown Bros. Real Estate Accounts, except that all client funds were contained in one account instead of five accounts.

20. The Marian Bank Real Estate Account produced a shortfall of $135,196.87. This shortfall was the cumulative result of Defendant's Unauthorized Disbursements from the Real Estate Accounts.

21. Plaintiff first learned of the Unauthorized Disbursements on June 19, 1990, when Alexander N. Rubin, Jr., received a telephone call from an officer at Marian Bank notifying him of an overdraft of approximately $60,000.

*Auditing of the Real Estate Accounts*

22. During the relevant period, Rubin Quinn's financial books and records were examined yearly by Rubin Quinn's outside accountants for the purpose of preparing federal and state income tax returns, K–1 forms, which were distributed to all partners, including Defendant, financial statements, and other financial documents.

23. At all relevant times, Defendant had sole responsibility for the operation, maintenance, record-keeping, review, and reconciliation of the Real Estate Accounts.

24. During the relevant period, the Real Estate Accounts were neither audited nor examined by Rubin Quinn's outside accountants.

25. Nineteen million six hundred thousand dollars ($19.6 million) flowed through the Real Estate Accounts during Defendant's four-and-one-half year tenure at Rubin Quinn.

*Failure to Disclose the Unauthorized Disbursements*

26. Defendant did not disclose any of the foregoing acts of wrongdoing until July 23, 1990, and actively attempted to conceal their full scope from Rubin Quinn as follows:

a. On January 22, 1990, Defendant attempted to cover a portion of the deficiency in the Marian Bank Real Estate Account by depositing a check in the amount of $30,000;

b. Immediately prior to detection of the shortfall, Defendant unsuccessfully attempted to wire transfer $50,000 into the Marian Bank Real Estate Account to cover up a portion of the deficiency;

c. On June 12, 1990, Defendant falsely stated to Robert Iadicicco, Rubin Quinn's Controller, who had received an overdraft notice from Marian Bank in the amount of $29,366.12, that the overdraft in the Marian Bank Real Estate Account was due to a deposited check that had not yet cleared;

d. On June 15 or 18, 1990, Defendant falsely stated to Mr. Iadicicco, who had

received a second overdraft notice from Marian Bank in the approximate amount of $59,000, that a client's check had been lost in the mail and that Defendant would have to ask the client to issue a new check; and

e. On June 15, 1990, in response to a memo from Denis J. Lawler, Rubin Quinn's Administrative Partner, dated June 12, 1990, Defendant falsely stated that:

(1) the Real Estate Accounts had been jointly administered by him and the Bookkeeping Department "since 1/1/90 at least";

(2) the Bookkeeping Department received statements of account, made copies, and gave the originals to Defendant to reconcile; and

(3) that he had met with Rubin Quinn's outside accountants and had given them copies of the reconciled account statements for 1989.

*Failure to Cooperate After Unauthorized Disbursements Were Uncovered*

27. After receiving the telephone call from an officer of Marian Bank on June 19, 1990, at 5:00 P.M., notifying him of the overdraft of approximately $60,000.00 in the Marian Bank Real Estate Account, Mr. Rubin sought out Defendant, but was unable to locate him because Defendant was gone for the day.

28. On June 21, 1990, Mr. Lawler sent a mailgram to Defendant requesting that Defendant contact one of several of Rubin Quinn's partners "ASAP." Lawler also left a message with Defendant's wife, Susan Kennel, that Defendant should contact him immediately.

29. Defendant never returned to Rubin Quinn's office as a working attorney after June 19, 1990.

30. During the time that Plaintiff investigated the Unauthorized Disbursements, the Defendant committed the following acts or omissions to act:

a. On June 24, 1990, during a meeting with Mr. Lawler and Mr. Jerrold V. Moss, another Rubin Quinn partner, Defendant denied knowledge of how the shortfall in the Marian Bank Real Estate Account had occurred and claimed that his only personal use of the Real Estate Accounts was a check dated February 14, 1990, in the amount of $14,000 payable to Jeffrey Galen Young that was issued on the same day Defendant made a deposit of $15,000 into the Marian Bank Real Estate Account;

b. During two meetings in July of 1990 with Ms. Martha Kinzel of Rainer and Company, Rubin Quinn's accountants, Defendant failed to disclose fully and completely the extent of the Unauthorized Disbursements;

c. By a letter dated July 7, 1990, Defendant falsely responded to a letter from Mr. Lawler seeking the whereabouts of the Brown Bros. records, stating that "[t]he checks and records for the Brown Brothers account [sic] should be in Records Management or in the File Room, depending upon the actions of whatever secretary I had at the time";

d. On July 29 or 30, 1990, during a meeting with Mr. Lawler, Defendant falsely stated that all premiums for title insurance to be issued by Lawyers Title Insurance Corporation in connection with real estate closings he had handled had been paid; and

e. Defendant misrepresented the whereabouts of the Brown Bros. records until July 23, 1990.

31. On November 2, 1992, at a deposition noticed by the Plaintiff, Defendant asserted his Fifth Amendment rights to all questions relating to the Unauthorized Disbursements from the Real Estate Accounts.

32. Although requested to do so, Defendant did not fully assist Rubin Quinn in investigating the extent of the Unauthorized Disbursements from the Real Estate Accounts.

33. Rubin Quinn reimbursed its clients in full for the shortfall in the Marian Bank Real Estate Account. The first reimbursement payment to a client was made on July 17, 1990. The total amount paid to reimburse clients was $124,927.87.

34. As a result of Defendant's conduct, Rubin Quinn has suffered the following additional damages:

a. Nine thousand, three hundred ninety-nine dollars and ninety-one cents ($9,399.91), the amount paid by Rubin Quinn as a result of charges to the Real Estate Accounts which related to Defendant's late payment of items listed on settlement sheets and bank service charges;

b. Twelve thousand, five hundred fourteen dollars and twenty-five cents ($12,-514.25), the amount paid by Rubin Quinn to Rainer and Company to audit the records of settlements conducted by Defendant; to determine the elements of Defendant's wrongful diversion of funds; and to identify any unsatisfied liabilities to third parties, such as unpaid title insurance premiums, taxes, water and sewer bills, judgments, recording costs, and other charges deducted at settlements, but not paid; and

c. Thirty-eight thousand and eight dollars ($38,008), representing the total amount of attorney time expended and costs incurred as a result of Rubin Quinn's investigation of Defendant's wrongful activities.

35. By letter dated October 18, 1990, Rubin Quinn supplied Defendant with a copy of Rainer & Company's reports, indicating a deficiency of $135,196.87 in the Real Estate Accounts and additional losses to Rubin Quinn of $9,399.91, and demanding restitution. Defendant has not made Rubin Quinn whole for these losses.

*Dishonesty Policy From CNA Insurance Company*

36. At all relevant times, Rubin Quinn was covered by an employee dishonesty policy (the "Policy") written by CNA Insurance Company ("CNA").

37. The Policy applied to the Unauthorized Disbursements under the following terms:

a. The Policy applied to the Unauthorized Disbursements made while Defendant was an associate at Rubin Quinn; the Policy did not apply to disbursements made while Defendant was a partner;

b. The Policy's limit was $100,000;

c. If there was a recovery after CNA paid sums to Rubin Quinn under the Policy, Rubin Quinn would be reimbursed for its losses (including costs of recovery) in excess of policy limits, and thereafter CNA would be subrogated to any recovery.

38. On June 27, 1990, Rubin Quinn gave notice to CNA of a claim under the Policy arising from Defendant's Unauthorized Disbursements from the Real Estate Accounts.

39. In late January 1991, CNA paid Rubin Quinn the policy limit of $100,000.

*Rubin Quinn's Overpayments to Defendant*

40. The Partnership Agreement, dated June 1, 1989, governed all of Defendant's rights and privileges as a partner at Rubin Quinn for the year 1990, including Defendant's right to receipt of payment as a partner.

41. The Partnership Agreement provided, in relevant part:

V. *DETERMINATION OF SHARE OF PROFITS, DRAWS, AND DISTRIBUTIONS*

A. Within 30 days after each fiscal year begins, and after providing to each Partner an opportunity to be heard, the Executive Committee shall determine each Partner's percentage share of profits for that year.

B. The Executive Committee shall also determine each Partner's draw and the amount and timing of distribution of profits.

. . . .

XXII. *PAYMENTS TO EXPELLED, DISABLED, WITHDRAWN OR DECEASED PARTNERS*

A. All payments to an expelled, . . . Partner shall be in full and complete discharge and satisfaction of all rights such a Partner may have had in the Partnership, including, but not limited to, receivables, goodwill, work in progress, personal property, fixtures, equipment, and all assets of any kind, physical or otherwise.

. . . .

C. An expelled Partner shall be paid his Capital Account, computed as of the date of the expulsion, in twenty-four (24) equal consecutive monthly payments and nothing further.

42. As a partner at Rubin Quinn, Defendant was paid a draw on account of his share of anticipated profits in accordance with the Partnership Agreement.

43. As of his expulsion on July 31, 1990, Defendant had been paid a draw in accordance with the determination of the Executive Committee in the total sum of $35,076.72.

44. As of July 31, 1990, Defendant's proportionate share of Rubin Quinn's year-to-date profits was $28,004.01.

45. As of July 31, 1990, therefore, Defendant had been paid a draw which was $7,072.71 more than his percentage interest in Rubin Quinn's profits.

46. After Defendant's expulsion effective July 31, 1990, upon notice to Defendant, Rubin Quinn applied Defendant's capital account of $4,665.56 against the aforesaid overpayment, resulting in a net sum due and owing by Defendant to Rubin Quinn in the amount of $2,407.15.

47. Although Rubin Quinn has made demand of Defendant for the above-referenced overpayment, Defendant has refused to pay such sums or any part thereof.

48. Rubin Quinn commenced the present action on March 9, 1992.

## II. DISCUSSION

■ In this diversity action, this Court must apply the substantive law of Pennsylvania as expressed in its statutes and case law. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Pennsylvania law affords Plaintiff relief on the grounds of indemnification, breach of fiduciary duty, and breach of contract. Statutes of limitations are, for this purpose, considered substantive law. See Ciccarelli v. Carey Canadian Mines, Ltd., 757 F.2d 548, 552 (3d Cir.1985) (citing Guaranty Trust Co.

v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945)). None of the claims are time-barred.

### A. Plaintiff is entitled to indemnification

■ Indemnification is the shifting of a loss from a less culpable party to a more culpable party. As the Pennsylvania Supreme Court held in Builders Supply Co. v. McCabe:

The right of indemnity rests upon a difference between the primary and the secondary liability of two persons each of whom is made responsible by the law to an injured party. It is a right which enures to a person who, without active fault on his own part, has been compelled, by reason of some legal obligation, to pay damages occasioned by the initial negligence of another, and for which he himself is only secondarily liable.

366 Pa. 322, 77 A.2d 368, 370 (1951).[6] Thus, to establish its claim for indemnity, a plaintiff must show that (1) it paid damages to an injured third party; (2) it was obligated to pay the damages to that party; and (3) its culpability was secondary to that of the defendant.

#### 1. Plaintiff paid damages to its defrauded clients

The record establishes that Plaintiff has paid $124,927.87 to the clients whose funds were converted by the Defendant.

#### 2. Plaintiff was obligated to pay the damages to its clients

To establish its obligation to pay damages, Plaintiff must first establish that Defendant was liable to Plaintiff's clients, and then establish its own responsibility for the defendant's liability.

■ The Defendant is liable for converting Rubin Quinn's clients' funds. "[C]onversion is the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without law-

---

6. The right to indemnity does not arise from negligence alone. For example, an employer may be secondarily liable (and hence entitled to indemnity) if his employee engages in willful

conversion. See Aiello v. Ed Saxe Real Estate, Inc., 508 Pa. 553, 499 A.2d 282, 285 (1985); Coles v. Sutphen, 167 Pa.Super. 457, 75 A.2d 623, 624–25 (1950).

ful justification." *Project Dev. Group, Inc. v. O.H. Materials Corp.*, 766 F.Supp. 1348, 1355 (W.D.Pa.1991) (citing *Shonberger v. Oswell*, 365 Pa.Super. 481, 530 A.2d 112 (1987)), *aff'd*, 993 F.2d 225 (3d Cir.1993). A person can convert money. *See Shonberger*, 530 A.2d at 114. An escrow agent, though he has lawful possession, is guilty of conversion if he breaches his duty to deliver escrowed funds, since legal title to the funds does not pass until they are delivered. *See Paul v. Kennedy*, 376 Pa. 312, 102 A.2d 158, 159 (1954); *see, e.g., In re 222 Liberty Associates*, 110 B.R. 196, 201 (Bankr.E.D.Pa.1990) (applying Pennsylvania law and holding that a broker who used funds he held in escrow to pay his own fees had converted the funds).

Defendant converted Rubin Quinn's clients' funds by his mishandling of the Real Estate Accounts. His authority as escrow agent was to hold the funds deposited with him and to disburse them as necessary to effect Rubin Quinn's clients' real estate transactions. The making of various payments that personally benefitted Defendant clearly exceeded this authority.

■ Further evidence of Defendant's misconduct is provided by his refusal to respond to Plaintiff's questioning at his deposition on grounds of self-incrimination. As the Supreme Court has stated, "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976). Considering the totality of the evidence offered against Defendant, this Court finds that the drawing of an adverse inference from Defendant's refusal to testify at his deposition is appropriate.

■ Rubin Quinn was liable to its clients for Defendant's misdeeds as an associate and as a partner. An employer is liable for conversions caused by his employee's misconduct, if the actions are within the scope of employment. *See Aiello v. Ed Saxe Real Estate, Inc.*, 508 Pa. 553, 499 A.2d 282, 285 (1985). " 'The master who puts the servant in a place of trust or responsibility ... is justly held responsible when the servant,

through lack of judgment or discretion, or from infirmity of temper, ... goes beyond the strict line of his duty or authority and inflicts an unjustifiable injury on another.' " *Coles v. Sutphen*, 167 Pa.Super. 457, 75 A.2d 623, 625 (1950) (quoting *Orr v. William J. Burns Int'l Detective Agency*, 337 Pa. 587, 12 A.2d 25, 27 (1940)). Defendant was charged with administering the Real Estate Accounts. He handled collections and distributions, and his disbursements, though they resulted in a conversion of clients' funds, were clearly within the scope of his authority.

■ Kennel's status change from employee to partner is of no consequence to the Plaintiff's vicarious liability. Under Pennsylvania statute, a partnership, and by extension its partners individually, is liable for any loss suffered by a third party due to a partner's misappropriation of funds while acting within the scope of his apparent authority. *See* 15 Pa.Cons.Stat.Ann. §§ 8326(1), 8327(1) (1993). Conversion of client escrow funds is perhaps a paradigmatic example of the statute's intended reach. *See Levy v. First Pa. Bank N.A.*, 338 Pa.Super. 73, 487 A.2d 857, 863 n. 16 (1985) (examining, in dicta, a law firm's liability for the embezzling of client funds by one of its partners and its right of indemnity therefrom). As discussed above, Kennel's disbursements were within the scope of his authority, and thus his partner's are liable for any losses occasioned by his mishandling of the Real Estate Accounts during his tenure as a partner.

■ Plaintiff's repayments to its clients were made under a legal duty to do so. The right to indemnity normally attaches when a judgment has been entered against and satisfied by a party. *See Oblon v. Ludlow–Fourth Corp.*, 406 Pa.Super. 591, 595 A.2d 62, 69–70 (1991), *appeal denied*, 533 Pa. 600, 617 A.2d 1274 (1992). However, if a party is legally liable on a claim, and payment could be compelled by the institution of court proceedings, the right to indemnity attaches when a settlement is made. *See Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 317 (3d Cir.) (applying Pennsylvania law), *cert. denied*, 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985). Plaintiff's pay-

ments to the aggrieved clients, though voluntary, in the sense that no judgment had been entered against it, were made under a legal obligation, and therefore triggered the right of indemnity.

### 3. *Plaintiff's liability was secondary to defendant's*

■ A party that is culpable, either as a sole or joint tortfeasor, is not entitled to indemnification, barring an agreement otherwise. *See Globe Indem. Co. v. Agway, Inc.,* 456 F.2d 472, 474–75 (3d Cir.1972) (applying Pennsylvania law). A prospective indemnitee's liability must be "secondary," arising from the relationship the indemnitee has with the true malefactor, rather than from any misconduct on the indemnitee's part. *See Burbage v. Boiler Eng'g & Supply Co.,* 433 Pa. 319, 249 A.2d 563, 567 (1969).

■ Rubin Quinn's liability to its clients is of this secondary nature. Kennel, and Kennel alone, was responsible for the misappropriation of the escrow funds. None of Rubin Quinn's partners or employees assisted Kennel in his malfeasance. Therefore, Plaintiff's liability was vicarious, or "secondary," stemming solely from Defendant's status as an employee and partner, and not from any misconduct on Plaintiff's part.

■ A prospective indemnitee who successfully establishes an indemnification claim can recover the monies paid to satisfy a judgment or to settle a claim. *See Philadelphia Electric Co.,* 762 F.2d at 316–17. Plaintiff has established that it paid $124,927.87 to its defrauded clients, and it is entitled to recover this amount in indemnification from the Defendant.

■ An indemnitee can also recover attorney's fees and costs incurred in defending the underlying action. *See Fleck v. KDI Sylvan Pools,* 981 F.2d 107, 117 (3d Cir.1992) (applying Pennsylvania law), *cert. denied,* —— U.S. ——, 113 S.Ct. 1645, 123 L.Ed.2d 267 (1993). However, recovery of fees incurred in litigating the indemnity action itself against the wrongdoer is not allowed. *See*

*id.* (citing *Boiler Eng'g & Supply Co. v. General Controls, Inc.,* 443 Pa. 44, 277 A.2d 812, 814 (1971)). Plaintiff has established that it expended $38,008 in establishing the extent of Defendant's wrongdoing and in identifying which of its clients were entitled to reimbursement. The amount of time required to be spent was exacerbated by Defendant's efforts at concealment. Rubin Quinn, therefore, is entitled to recover these funds for the work done by its own attorneys.[7]

### B. *Plaintiff is entitled to damages for breach of fiduciary duty.*

Defendant, both as an employee of and partner in Plaintiff's predecessor, owed Plaintiff a fiduciary duty. Defendant's mishandling of the Real Estate Accounts was a breach of this duty, and Plaintiff may recover from the Defendant the damages that resulted from this breach.

### 1. *Defendant breached his fiduciary duties to Plaintiff while Defendant was Plaintiff's employee*

■ During Defendant's tenure as an employee of Plaintiff's predecessor, he was in an agency relationship with the Plaintiff. As an agent, Defendant was "a fiduciary with respect to matters within the scope of his agency and [was] required to act solely for the benefit of his principal in all matters concerned with the agency." *SHV Coal, Inc. v. Continental Grain Co.,* 376 Pa.Super. 241, 545 A.2d 917, 921 (1988) (citing *Onorato v. Wissahickon Park, Inc.,* 430 Pa. 416, 244 A.2d 22, 26 (1968)), *rev'd on other grounds,* 526 Pa. 489, 587 A.2d 702 (1991). This duty of loyalty was breached by the Defendant when he used the Real Estate Accounts he was administering to make payments to advance his own interests, rather than those of his employer or of his employer's clients.

### 2. *Defendant breached his fiduciary duties to Plaintiff while Defendant was a partner*

It is axiomatic that a fiduciary relationship exists between partners. *See Stainton v.*

---

7. In the alternative, the awarding of damages for the monies expended in investigating Defendant's conduct can be grounded on a breach of

fiduciary duty theory. The need for investigation is a likely consequence of such a tort, and is a compensable injury. *See infra.*

*Tarantino,* 637 F.Supp. 1051, 1066 (E.D.Pa. 1986); *Clement v. Clement,* 436 Pa. 466, 260 A.2d 728, 729 (1970). From the time he was admitted as a partner in Plaintiff's predecessor in January of 1988, and up until his expulsion in July of 1990, Defendant had a fiduciary duty to each of his partners. By engaging in the misappropriation of funds from the Real Estate Accounts, and by failing to cooperate with his partners when his malfeasance was uncovered, Defendant breached this duty.

### 3. *Defendant is liable for the damages caused by his breach of duty*

 A tortfeasor is liable for damages that are the reasonably foreseeable consequence of his actions. *See Frank v. Volkswagenwerk, A.G. of W. Germany,* 522 F.2d 321, 323 n. 1 (3d Cir.1975). The expenses incurred by Plaintiff as a result of Defendant's malfeasance, as well as the costs associated with the discovery of and payment to the victims of Defendant's wrongdoing, were clearly foreseeable results of Defendant's conduct. Thus, the Defendant is liable for the $9,399.91 paid by Plaintiff in additional charges to the Real Estate Accounts and the $12,514.25 paid to Rainer & Company for their investigation of Defendant's actions.

### C. *Defendant must repay his excessive partnership draw*

 The Partnership Agreement was a valid contract between Defendant and Plaintiff's predecessor. The Agreement modifies the normal method of partner remuneration, the distribution of profits, *see* 15 Pa.Cons. Stat.Ann. § 8331 (1993), by allowing each partner a draw, an advance by the partnership based on a partner's share of anticipated profits. The draw that had been paid to Defendant by July of 1990 was in excess of his actual share of profits by $7,072.71. Defendant's retention of this excess is in breach of the Partnership Agreement, and Plaintiff is entitled to be made whole through restitution of this amount. *See American Air Filter Co. v. McNichol,* 527 F.2d 1297, 1299 (3d Cir.1975) ("[T]he 'aim of the law in awarding

compensatory damages for breach of contract is to put the injured party in the position he would have been in had there been full performance.'") (quoting *Maxwell v. Schaefer,* 381 Pa. 13, 112 A.2d 69, 73 (1955)). Since Plaintiff has already applied Defendant's capital account against the overpayment, Plaintiff is entitled to the remaining overpayment, $2,407.15.

### D. *Plaintiff's damages are not reduced by the payments received from CNA Insurance Co.*

 Under Pennsylvania's collateral source rule, a plaintiff's recovery from a defendant is not reduced if the plaintiff has been wholly or partially compensated for his injuries by an independent third party. *See Feeley v. United States,* 337 F.2d 924, 926–28 (3d Cir.1964); *Beechwoods Flying Serv., Inc. v. Al Hamilton Contracting Corp.,* 504 Pa. 618, 476 A.2d 350, 352 (1984). The policy behind this doctrine is that a wrongdoer should not benefit from the existence of a collateral remedy. *See Greenwood v. Hildebrand,* 357 Pa.Super. 253, 515 A.2d 963, 968 (1986), *appeal denied,* 515 Pa. 594, 528 A.2d 602 (1987). Plaintiff received $100,000 from CNA under its employee dishonesty policy. Any recovery from Defendant will be in addition to these insurance proceeds and will be applied to make Rubin Quinn whole to the full extent of its out-of-pocket losses. Beyond that amount, CNA is subrogated to any recovery to the extent of the payment it made under the Policy.

Defendant's belief that these proceeds did not come from an independent source because as a partner of Rubin Quinn he paid premiums under the Policy is mistaken. The Policy was limited to *employee* dishonesty— it only covered Defendant's actions during his tenure as an associate. Defendant therefore paid no premiums on the Policy during the period he was an associate and converted $132,733.77 in client funds.[8]

### E. *None of Plaintiff's causes are time-barred*

 The statute of limitations bars an action commenced after the statutory period

---

**8.** If Defendant is credited with the deposits he made into the Real Estate Accounts while an associate, the net amount converted was $121,-401.28.

for that action has expired. *See Hayward v. Medical Ctr. of Beaver County*, 530 Pa. 320, 608 A.2d 1040, 1043 (1992). The period begins when the cause of action accrues (i.e., when the right to institute a law suit arises), *see id.* 608 A.2d at 1042, and ends after a statutorily mandated duration, *see, e.g.*, 42 Pa.Cons.Stat.Ann. § 5524 (1993) (mandating a two year period for various actions). Unless its application is tolled, the statute will act as a complete bar to an action. Defendant's statute of limitations defenses in this case are meritless. Plaintiff's action was commenced within the time allowed by Pennsylvania statutes for each of Plaintiff's claims.

### 1. *Indemnification*

▮ The cause of action for indemnification does not accrue until a prospective indemnitee actually makes payment to a third party. *See Rivera v. Philadelphia Theological Seminary of St. Charles Borromeo, Inc.*, 510 Pa. 1, 507 A.2d 1, 15 (1986). Since the indemnification in this case was implied, and was not the subject of an express written agreement, a statutory period of four years is applicable. *See* 42 Pa.Cons. Stat.Ann. § 5525(4) (1993) (providing a four-year period for contracts implied in law). Plaintiff's cause of action accrued when it made its first payment to its defrauded clients on July 17, 1990. The present action, filed on March 9, 1992, was commenced within the statutory period.

### 2. *Breach of Fiduciary Duty*

▮ The statutory period for breach of fiduciary duty is two years. *See* 42 Pa.Cons. Stat.Ann. § 5524(7) (1993); *Gurfein v. Sovereign Group*, 826 F.Supp. 890, 917–18 (E.D.Pa.1993). The cause of action accrued when Defendant began to misappropriate funds. *Cf. Schwartz v. Pierucci*, 60 B.R. 397, 403 (E.D.Pa.1986) (holding that a fiduciary who fails to disclose fraudulent activities commits a continual fraud, tolling the statute until the end of the fiduciary relationship). Thus, absent tolling of the statute, much of Plaintiff's claim would be time-barred since Defendant began his misappropriation in late 1986.

▮ Plaintiff's claim is saved by the discovery rule. As explained by the Third Circuit, "[t]he discovery rule tolls the statute of limitations when a plaintiff, despite the exercise of due diligence, is unable to know of the existence of the injury and its cause." *Bohus v. Beloff*, 950 F.2d 919, 924 (3d Cir.1991) (citing *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 503 Pa. 80, 468 A.2d 468, 468 (1983)). Plaintiff became aware of Defendant's misconduct on June 19, 1990, when it received the telephone call from Marian Bank disclosing an overdraft of approximately $60,000.

▮ The issue is whether Plaintiff exercised due diligence in supervising Defendant's conduct. Given Defendant's position as a fiduciary of the firm, and the complexity of the real estate transactions which gave rise to the Real Estate Accounts, the Court concludes that Plaintiff did exercise due diligence in its oversight of Defendant's management of the accounts. Defendant was a member of the bar, skilled in complex transactions. First as an employee, and later as a partner, he sought and was accorded in return the trust of Rubin Quinn's partners. Ironically, it is this type of very special relationship that enables a wayward fiduciary to engage in acts of concealment that "cause the [principal] to relax vigilance or deviate from the right of inquiry." *Ciccarelli*, 757 F.2d at 556. To require a principal to engage in aggressive oversight of its fiduciary's conduct is to deny the very essence of a fiduciary relationship. Therefore, the present action is not time-barred as it was commenced less than two years after the day Rubin Quinn knew or should have known of Defendant's malfeasance.

### 3. *Breach of Contract*

▮ The statutory period for an action upon a written contract is four years. *See* 42 Pa.Cons.Stat.Ann. § 5525(8) (1993). Defendant breached the contract when he refused to return the funds advanced to him. Since the earliest the demand could have been made was at Defendant's expulsion from the firm on July 31, 1990, Plaintiff's claim is not time barred.

### F. *Plaintiff will not be awarded punitive damages*

Punitive damages may be awarded when a tortfeasor's "actions are of such an outrageous nature as to demonstrate intentional, willful, wanton or reckless conduct." *SHV Coal, Inc. v. Continental Grain Co.*, 526 Pa. 489, 587 A.2d 702, 704 (1991). They are imposed to punish an individual for egregious behavior, as well as to deter him and others from engaging in similar conduct. *See Allstate Ins. Co. v. A.M. Pugh Assocs., Inc.*, 604 F.Supp. 85, 99 (M.D.Pa.1984). The decision to award such damages must take into account the egregious conduct as well as all the circumstances surrounding the conduct, including the relationship, if any, between the parties. *See Brooks ex rel. Stanton v. Astra Pharmaceutical Prods., Inc.*, 718 F.2d 553, 580 (3d Cir.1983). The tortfeasor's wealth must also be examined in relation to the harm intended by the punitives. *See Kirkbride v. Lisbon Contractors, Inc.*, 521 Pa. 97, 555 A.2d 800, 803 (1989); *see also Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 740 (3d Cir.1991) (citing *Kirkbride*), cert. denied, —— U.S. ——, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992). The granting of punitives is within the fact-finder's discretion. *See SHV Coal*, 587 A.2d at 705.

On balance, and under the circumstances of the case, this Court will not award punitive damages to the Plaintiff. While Plaintiff's oversight of Defendant's activities conformed to the requisite level of diligence, it lacked the desirable vigilance Rubin Quinn should have displayed in handling client funds. While this was legally sufficient to satisfy the Plaintiff's duty of diligence, the Court will not endorse it as the best prophylactic against financial wrongdoing by an agent. Moreover, any recovery in excess of the loss would go to Plaintiff and not to the actual victims of the conversion, Rubin Quinn's clients. Therefore, the Court finds that the award of punitive damages would bestow upon Plaintiff an unjust windfall.

Finally, the record is devoid of evidence concerning Kennel's wealth. In assessing punitives, this Court is required to assess the impact the damages would have on the Defendant's financial position. *See Kirkbride*, 555 A.2d at 803. There being no evidence concerning Defendant's wealth, this Court will refrain from awarding punitive damages.

### III. *CONCLUSIONS OF LAW*

1. This Court has jurisdiction over this action in that Plaintiff is a Pennsylvania professional corporation and Defendant is a citizen of Virginia and the amount in controversy is in excess of $50,000, exclusive of interest and costs. *See* 28 U.S.C.A. § 1332(a) (West 1993).

2. Venue is proper in the Eastern District of Pennsylvania in that, *inter alia*, a substantial part of the events giving rise to the plaintiff's claim occurred within this federal district. *See* 28 U.S.C.A. § 1391(a) (West 1993).

3. During the time Defendant was an associate and partner at Rubin Quinn, he converted to his personal use $124,927.87 of client funds that were entrusted to him in connection with his handling of real estate transactions for Rubin Quinn's clients.

4. Rubin Quinn is entitled to damages in the amount of $124,927.87 as indemnification for the payments it made to Rubin Quinn clients whose funds were converted by Defendant.

5. Rubin Quinn is entitled to damages in the amount of $38,008 as indemnification for the attorney fees and costs it incurred in investigating Defendant's misconduct and determining the extent of its clients' losses.

6. Defendant, both as an associate and partner at Rubin Quinn, held a position of trust. Defendant breached his fiduciary duties to Rubin Quinn by converting $124,927.87 from the Real Estate Accounts which were entrusted to him in connection with his performance of services as an attorney at Rubin Quinn.

7. As a result of Defendant's breach of fiduciary duty, Defendant caused Rubin Quinn additional damages in the amount of $9,399.91 in bank and settlement charges, and $12,514.25 for investigation by Rainer and Company.

8. Defendant breached the Partnership Agreement by failing to return to Rubin

Quinn the net amount of $2,407.15, representing an overpayment to him by Rubin Quinn of his proportionate share of Rubin Quinn's year-to-date profits for the year 1990.

9. The statute of limitations applicable to indemnity claims did not begin to run until at least July 17, 1990, the date of Rubin Quinn's first reimbursement of a third party for losses caused by Defendant's wrongful activities.

10. The statute of limitations applicable to breach of fiduciary duty claims did not begin to run until June 19, 1990, the date on which Rubin Quinn first learned of the misappropriation of client funds.

11. The statute of limitations applicable to breach of contract claims did not begin to run until at least July 31, 1990, when Defendant was expelled from Plaintiff's predecessor.

12. The collateral source rule does not require Rubin Quinn to deduct CNA's payment of $100,000 for Defendant's actions as an associate from Rubin Quinn's damages. The payment was from an independent source, since Defendant paid no portion of the Policy's premiums while he was employed as an associate.

13. Plaintiff is not entitled to recover punitive damages. Although Defendant's behavior is wanton and willful, Plaintiff's relative laxity in overseeing Defendant's actions and its failure to present evidence of Defendant's net worth militates against the imposition of punitives.

## IV. CONCLUSION

Defendant is liable for indemnification, breach of duty, and breach of contract. Plaintiff has suffered damages in the amount of $184,850.03 and judgment in its favor will be entered.